**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES,<br>    Plaintiff,<br>vs.<br>BARBARA JOAN LOPP,<br>    Defendant. | Case No.: 15-00373 YGR<br><br>**ORDER GRANTING MOTION OF DEFENDANT TO SUPPRESS EVIDENCE**<br><br>Re: Dkt. No. 68 |

Defendant Barbara Joan Lopp was indicted for violation of 18 U.S.C. section 1349, conspiracy to commit bank fraud, on July 16, 2015. (Indictment, Dkt. No. 25.) Lopp filed a Motion to Suppress Evidence regarding statements she made during an investigatory stop and thereafter, as well as the physical evidence seized from her person and rental vehicle during her arrest. (Dkt. No. 68, "Mtn.") The government has opposed the motion. (Dkt. No. 72, "Oppo.") Oral argument was held on February 25, 2016, and an evidentiary hearing took place on March 24, 2016. The parties filed additional briefing subsequent to the hearing.

Having carefully considered the papers submitted, the pleadings in this action, oral argument, and for the reasons set forth below, the Court hereby **GRANTS** the Motion to Suppress Evidence.

## I. BACKGROUND

On February 12, 2015, at approximately 10:34 a.m. on a Thursday in Sioux City, Iowa, a bank manager at the Municipal Credit Union ("the credit union") called the police to report an ongoing fraudulent credit card transaction. (Corrected Exhibit A ["Lewis Report"] to Declaration of Detective Lewis, Dkt. No. 76, at FBI-003585.) The bank manager reported that an individual

1  with a fraudulent credit card and California identification was requesting a credit card advance, and
2  that he had attempted the same transaction the week before.  (*Id.* at FBI-003560; Declaration of
3  Detective Lewis ISO Surreply ["2d Lewis Decl."], Dkt. No. 84-1, at Exh. A ["CAD Call
4  Information"] at 1.)  The report described the suspect as a "black male wearing blue jeans with a
5  brownish-colored coat."  (Lewis Report at FBI-003560.)  Police dispatch conveyed this information
6  between 10:32 and 10:36 a.m.  (CAD Call Information at 1.)

7  By 10:39 a.m., Sioux City Police Department ("SCPD") officers arrived on the scene.  One
8  officer followed a maroon truck that had just left the area, and stopped it at a nearby car wash.
9  (Lewis Report at FBI-003585.)  A dash-cam recorded the officer's conversation with the driver.
10  (Evidentiary Hearing Exhibit D-2 ["Stroman Dash-Cam Video"].)  The officer told the driver,
11  "[y]ou probably have nothing to do with this, but we've got somebody inside the credit union right
12  now that we've been looking for and wanting to talk to.  So we didn't know if you were with him,
13  waiting to pick him up."  (*Id.* at 1:46-1:55.)  Upon further questioning, the officer determined the
14  driver was uninvolved and concluded the stop.  (Lewis Report at FBI-003585.)

15  Radio traffic about the credit card fraud reached Woodbury County Sheriff's Office
16  ("WCSO") Deputy Lenz and his field-training officer, Deputy Brand, while on patrol.  (Declaration
17  of Deputy Lenz ["1st Lenz Decl."], Dkt. No. 72, at ¶ 2.)  The substance of this radio traffic was in
18  dispute at the evidentiary hearing.  Both deputies testified that they heard a request to search the
19  area for a vehicle with out-of-state plates and a female accomplice.  (Evidentiary Hearing
20  Transcript ["TR"], Dkt. No. 103-1, at 25:3-7, 140:24-141:3.)  However, Deputy Lenz's
21  contemporaneous reports, which Deputy Brand helped him write in his capacity as a training
22  officer, did not include any mention of a radio traffic about a search for a female specifically.  (1st
23  Lenz Decl., Exh. A, at WCSO_00010-00011.)  Furthermore, no record indicates that any dispatch
24  carried this advisory.  (*See* CAD Call Information at 1.)  Accordingly, the Court assumes that, at
25  this point in time, the deputies knew only that there might be an accomplice in a vehicle, and that
26  the suspect in the credit union was from out of state.

27  The deputies drove toward the credit union to assist the SCPD.  (*Id.*)  As the deputies neared
28  the credit union parking lot, they noticed a stationary silver SUV across the street.  (1st Lenz Decl.

United States District Court
Northern District of California

1  at ¶ 2.) It is disputed whether the car was idling or parked without the engine running, and the
2  declarations of the deputies are somewhat inconsistent on this point. (1st Lenz Decl. at ¶ 2;
3  Declaration of Deputy Brand, Dkt. No. 72-3, at ¶ 3.) A white woman sat in the driver's seat, and
4  the car had a Wisconsin license plate. (*Id.*) The deputies made a U-turn, driving by the silver SUV
5  a second time before entering the credit union parking lot. (Declaration of Deputy Lenz ISO
6  Surreply ["2d Lenz Decl."], Dkt. No. 84-3, at ¶¶ 2, 3.) According to the deputies' testimony, the
7  woman in the driver's seat appeared nervous and avoided eye contact. (*See* Brand Decl. at ¶ 3.)
8  Deputy Lenz testified that when he looked at the driver, "she slowly turned her head to kind of take
9  a look at us, and as soon as we made eye contact, her head snapped back forward and she stared
10 straight ahead…." (TR at 31:8-13.) When the deputies pulled into the parking lot, the silver SUV
11 drove away in the same direction that it faced. (1st Lenz Decl. at ¶ 3.)

12       Deputy Brand spoke with SCPD Officer Johnson in the parking lot. (Lewis Report at FBI-
13 003561.) Deputy Brand informed Officer Johnson that there was a woman sitting in a silver SUV
14 "for no real purpose" and asked if he "wanted the vehicle stopped so we could identify the driver."
15 (*Id.*) Officer Johnson replied yes. (*Id.*) Officer Johnson's report notes that the car "had Wisconsin
16 plates, which links back to a rental company." (*Id.*) However, aside from testimony at the
17 evidentiary hearing, no contemporaneous report records that the deputies actually ran the license
18 plate prior to the stop. It is unlikely that the officers had time to run the license plate in the mere
19 minutes that passed between pulling into the parking lot, speaking to Johnson, and then following
20 the silver SUV. The Court thus finds it more probable that Officer Johnson made this inference
21 about a link to a rental car company independently of any report or conversation, and that the
22 deputies did not run the license plate until after, not before, the stop.

23       After their conversation with Officer Johnson, the deputies followed the silver SUV. At
24 10:43 a.m., a radio dispatch conveyed that law enforcement should be on the look-out for a black
25 mini-van with out of state plates, possibly from Pennsylvania, with one black female and two black
26 males. (2d Lewis Decl. at ¶ 6; TR at 62:10-63:10.) They pulled the silver SUV over sometime
27 between 10:44 and 10:45 a.m. (1st Lenz Decl. at ¶ 4; 2d Lewis Decl. at ¶ 6.) The deputies heard
28 the dispatch before they exited the patrol car. (TR at 37:24-38:8.)

Upon request, the vehicle's driver presented partial rental car paperwork—it was missing the page listing the authorized drivers— and a paper California driver's license identifying herself as Barbara Lopp. (TR at 40:6-13.) Deputy Brand observed what appeared to be credit card statements in the back of Lopp's car. (Brand Decl. at ¶ 4.)

The deputies returned to the patrol car to run Lopp's information. They discovered that Lopp was on supervised release in Florida for grand theft, and that there was a non-extraditable warrant out of Texas for her arrest on charges of credit card fraud. (TR at 147:18-23.) The deputies communicated this information to the SCPD. The dash-cam video reveals that Deputy Brand stated, "We don't have any charges on her right now." (Evidentiary Hearing Exh. D-4 [Lenz/Brand Dash-Cam Video] at 7:08; TR at 182:14-23.) Nevertheless, the deputies agreed to detain Lopp until the SCPD officers could arrive to question and arrest her. (Exh. D-4 at 7:16-7:46; TR at 148:20-25.) They then returned to Lopp's car to interrogate her further. (Exh. D-4 Video at 7:46-8:38; TR at 150:13-152:2.)

Deputy Lenz asked Lopp what she was doing in town, and Lopp replied that she was visiting her uncle. (1st Lenz Decl. at ¶ 4.) When asked where her uncle lived, Lopp said she did not know. (*Id.*) She then said she was waiting for her brother, Michael Thomas. (*Id.*; *see also* Brand Decl. at ¶ 4.) Deputy Brand read Lopp her *Miranda* rights. (1st Lenz Decl. at ¶ 5.) Deputy Lenz then inquired about Thomas' whereabouts, and Lopp pointed in the direction of a street south of the bank. (*Id.*) When asked what Thomas was wearing, she at first stated she did not know, but later offered a description that matched the SCPD's profile of the suspect in the credit union. (*Id.*)

SCPD officers eventually arrived, arrested Lopp, and took her to the station for questioning, where Lopp made further statements. (TR at 151:16-152:8; Lewis Report at FBI-003587.) Later, pursuant to the search warrant, the SCPD searched the rental car. (*Id.*) Among the papers discovered in the vehicle was a Walmart money transfer form. (*Id.*)

## II. DISCUSSION

Lopp premises her motion to suppress upon the following contentions: (1) the deputies lacked reasonable suspicion to conduct the initial investigatory stop; (2) the investigatory stop was prolonged and evolved into an unlawful arrest; and, (3) law enforcement arrested her absent

4

1  probable cause.  The government asserts that law enforcement acted within the guarantees of the
2  Fourth Amendment in all instances.

3        The Fourth Amendment protects "[t]he right of the people to be secure in their persons,
4  houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.
5  The government bears the burden of proving that a warrantless search or seizure falls within an
6  exception to the warrant requirement.  *United States v. Scott*, 705 F.3d 410, 416-17 (9th Cir. 2012).
7  The Court finds that the government failed to meet this burden.

8        The government argues that Lopp's nervous, evasive behavior and proximity to a crime in
9  progress gave the deputies reasonable suspicion to conduct an investigatory stop.  According to the
10 government's proffered testimony, Lopp conspicuously avoided eye contact with the deputies
11 before driving away from the credit union.  The deputies found the fact that she "stared straight
12 ahead" suspicious because, "normally, when there's a bunch of officers in the area, people kind of
13 look and see – kind of want to know what's going on."  (TR at 31:21-25.)  Furthermore, Lopp's car
14 bore a Wisconsin license plate, suggesting that she, like the suspect in the bank, was from out of
15 state.  These observations, combined with the dispatch suggesting the existence of an accomplice in
16 a rental vehicle, are in the government's view sufficient to justify the investigatory stop.  The Court
17 disagrees.

18       The Fourth Amendment permits brief investigative stops only when an officer is able to
19 identify "[s]pecific and articulable facts which, taken together with reasonable inferences from
20 those facts, reasonably warrant that intrusion."  *Terry v. Ohio*, 392 U.S. 1, 21 (1968).  The
21 reasonable suspicion requirement is satisfied when law enforcement conveys "a particularized and
22 objective basis for suspecting the particular person stopped of criminal activity."  *Navarette v.*
23 *California*, __U.S.__, 134 S. Ct. 1683, 1687 (2014); *United States v. Twilley*, 222 F.3d 1092, 1095
24 (9th Cir. 2000).  An "unparticularized suspicion or 'hunch'" is insufficient to justify a stop.  *Terry*,
25 392 U.S. at 27.

26       Courts look to the "totality of the circumstances" to determine the lawfulness of a stop.
27 *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  Officers may draw on "their own experience
28 and specialized training to make inferences from and deductions about the cumulative information

available to them." *Id.* To a trained eye, the sum of innocuous activities may ripen into reasonable suspicion that a crime is in progress. *United States v. Sokolow*, 490 U.S. 1, 10 (1989); *Illinois v. Gates*, 462 U.S. 213, 268 (1983). In addition, "[n]ervous, evasive behavior is [a] pertinent factor in determining reasonable suspicion and headlong flight is the consummate act of evasion." *Illinois v. Wardlow*, 528 U.S. 119 (2000) (internal citation omitted). However, "an individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." *Id.* at 124.

Here, the totality of the circumstances indicates that the deputies lacked the requisite reasonable suspicion to justify the initial stop. The record indicates that the basis for this investigatory stop, while made in good faith, amounted to little more than an "unparticularized hunch." *Terry*, 392 U.S. at 27. It appears that law enforcement sought to stop any vehicle that was in the vicinity of the ongoing crime, whether the maroon truck at the carwash or the silver SUV parked curb-side across the street. Proximity to the scene of a crime, however, cannot by itself furnish reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119 (2000). This type of indiscriminate sweep, absent certain narrow exceptions to the warrant requirement, is impermissible under the Fourth Amendment. If there is a particularized basis for the stop, it is the government's burden to articulate it. *Scott*, 705 F.3d at 416-17. Here, the government's attempts to articulate the basis for the stop fall short for several reasons.

First, the discrepancies between accounts render it difficult to credit any one version of events concerning Lopp's purportedly nervous and evasive behavior. Indeed, even the government admits that the record is uncertain, stating in its final brief that many details crucial to a finding of reasonable suspicion "may or may not" have happened. (United States' Reply to Defendant Lopp's Summation, Dkt. No. 105, at 2:20-28, 3:1-7.) The deputies' reports of their initial observations of

Lopp have undergone multiple substantive revisions over the course of this litigation.[1]  While imperfect record-keeping is not out of the realm of the ordinary, the inconsistencies are particularly odd given that Deputy Lenz was in training and thus received extensive instruction from Deputy Brand.  In this context, the Court would expect the utmost exertion of due diligence and caution in preparing the police reports.  These inconsistencies and revisions weaken the government's proffered narrative.

Second, the government's position is severely undermined by the fact that the deputies' observations of Lopp did not corroborate crucial details in the sole dispatch specifying the profile of a potential accomplice.  *Cf. Navarette,* 134 S.Ct. at 1686-87 (officers corroborated the license plate number and car location provided by anonymous caller before stopping the car).  The dispatch told law enforcement to be on the lookout for a black minivan with out of state plates, possibly from Pennsylvania, and a black woman and two black men.  Deputies Brand and Lenz observed a silver SUV with a Wisconsin license plate, and a white woman.  No other radio traffic or dispatch on the record provided the deputies a different profile.  (Summation Reply, 2:20-22 ["the reports and dispatch records do not contain that detail"].)  This dispatch issued and the deputies heard it before they conducted the stop.  The discrepancy between the dispatch and what the deputies observed weighs heavily against a finding that law enforcement harbored a particularized basis for the stop.  The fact that the SCPD stopped another car in the vicinity further adds to the Court's perception of this as a perhaps well-intentioned but constitutionally impermissible general sweep.

---

[1] The Court notes several discrepancies in key areas.  In the original police reports and Deputy Lenz's first declaration, Lopp made a suspicious U-Turn; a revised declaration clarifies that it was the deputies who made the U-turn.  (*See* 2d Lenz Decl. at ¶¶2, 3.)  The police reports made no mention of radio traffic about a female accomplice, but the deputies subsequently stated, over a year later, that such an advisory served as the basis for the stop.  Similarly, neither of the deputies wrote in their police report or in subsequent declarations that they ran Lopp's plates prior to their conversation with Officer Johnson.  Rather, it appears that Officer Johnson retrospectively made this assumption, which the government now uses in support of its argument.  In addition, the deputies offer conflicting testimony with respect to whether Lopp's car was idling or parked without the engine running on the other side of the street.  Deputy Lenz asserts car was idling, whereas Brand states the car was parked but makes no mention of it idling.  Irrespective of whether or not idling contributes to a total picture of nervousness, the inconsistency renders this detail unpersuasive.

7

Absent a more specific tip or dispatch regarding the accomplice, the government must rely upon the deputies' independent observations of Lopp's behavior in its articulation of the grounds for reasonable suspicion. One key observation was that Lopp "consciously" avoided eye contact, whereas innocent people tend to look over at police activity. The Court does not discount this detail, but is reluctant to allot it substantial weight. *See United States v. Montero-Camargo*, 208 F.3d 1122, 1136 (9th Cir. 2000) (eye contact "or lack thereof" is generally "of questionable value" in the reasonable suspicion analysis). Courts in this circuit generally view details about eye contact with skepticism, recognizing that "reliance upon 'suspicious' looks can so easily devolve into a case of damned if you do, equally damned if you don't." *Id.* Such a subjective detail must be evaluated according to the circumstances of each individual case. *Id.* Context matters: it may be normal for an individual in Oakland to avoid eye contact with an officer observing him, but utterly unusual for a citizen in Sioux City to do the same. *Arvizu*, 534 U.S. at 275-76 ("slowing down, stiffening of posture, and failure to acknowledge a sighted law enforcement officer might well be unremarkable in one instance…while quite unusual in another"). However, the government does not raise this contextual distinction—it just suggests that most passersby react to police activity by wanting to know more, no matter where they live. The Court finds it equally plausible that an innocent individual might intently look at her phone, and then, upon observing an officer watching her, feel uncomfortable and abruptly look away. This fact alone does not meet the reasonable suspicion standard.

The deputies also observed that Lopp drove away soon after they pulled into the parking lot, which they found suspicious in light of her earlier body language. This action, the government argues, constitutes evasion and flight, particularly in light of her nervous behavior. However, the government's characterization of Lopp's driving away as flight—the "consummate act of evasion"—is inapposite. *Wardlow*, 528 U.S. at 119. Flight is the opposite of "going about one's business." *Id.* at 125. Typically, it is an extreme reaction to the mere presence of law enforcement: a sudden and high speed departure. For instance, in *Illinois v. Wardlow*, the Supreme Court found reasonable suspicion where the defendant, upon sight of officers patrolling for narcotics in a high crime area, ran—not walked—through a gangway and alley. *Id.* at 121-22, 125; *see also United*

*States v. Smith*, 633 F.3d 889, 894 (9th Cir. 2011) (Smith's sudden, unprovoked, headlong flight was suggestive of wrongdoing under the circumstances and established reasonable suspicion). Similarly, in *United States v. Drake*, a case upon which the government heavily relies, the Ninth Circuit found reasonable suspicion where officers observed a lone car late at night driving at a high rate of speed mere minutes after a robbery. *United States v. Drake*, 543 F.3d 1080, 1088 (9th Cir. 2010). The smell of burning fluid indicated the haste of the vehicle, and the driver turned to look at the officers behind him, conveying "consciousness of guilt." *Id.* The Ninth Circuit referred to this set of facts as a "close" case. *Id.* Not so here.

The record here does not indicate that Lopp's actions constitute flight. Unlike *Drake*, which took place late at night on an otherwise deserted road, in Lopp's case, it was mid-morning on a street corner. In both *Drake* and *Wardlow*, the defendant left the scene at a high speed. Here, the testimony indicates that Lopp simply drove away at a normal speed in the same direction her car was facing. This does not rise to the level of unprovoked flight seen in *Wardlow* and *Drake*. Rather, it appears that Lopp was an individual "going about her business." By the government's reasoning, any individual who is parked and then lawfully drives away from the site of law enforcement activity could be subject to a warrantless search.

Finally, at the time of the stop there was nothing linking Lopp to criminal activity or the suspect inside the credit union. None of the deputies saw her speak to the suspect, or even enter the credit union. *Cf. United States v. Johnson*, 581 F.3d 994, 997 (9th Cir. 2009) (officers observed defendants case the bank, leave the bank, and all return to the same vehicle before conducting an investigatory automobile stop) (*superceded on other grounds as stated in United States v. Barrow*, 606 F. App'x 335, 337 (9th Cir. 2015)). The Court finds that deputies could not have run her license plate prior to the initial stop—they only learned of Lopp's criminal history in Texas and Florida after they pulled her over. Officer Johnson had not arrested Thomas or questioned him about an accomplice when he sanctioned the decision to follow the silver SUV. The deputies thus possessed no knowledge of Lopp's ties to criminal activity, or to this particular crime, at the time that they pulled her over.

In sum, the government's case is this: a woman in a car with a Wisconsin license plate left a curb-side parking spot when more law enforcement arrived to help investigate a credit card fraud. Instead of exhibiting curiosity, she avoided eye contact. She did not match a single descriptor provided by a police dispatch detailing the profile of the suspected accomplice. The totality of the circumstances indicates that the government has not articulated "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette,* 134 S. Ct. at 1687 *(quoting United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). Accordingly, the deputies lacked reasonable suspicion sufficient to satisfy the requirements of the Fourth Amendment.

In light of the fact that this initial stop was unlawful, so, too, were the arrest and statements that flowed from the stop. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963) ("evidence seized during an unlawful search [cannot] constitute proof against the victim of the search…the exclusionary prohibition extends as well to the indirect as the direct products of such invasions"). Thus, the Court need not reach the remainder of the parties' arguments.

### III. CONCLUSION

Accordingly, for the reasons set forth above, the Motion to Suppress Evidence is **GRANTED**. This terminates Docket No. 68.

**IT IS SO ORDERED**.

Dated: May 10, 2016

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**